In the Matter of PETER G. SCHMIDT, an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, February 2, 1989

**APPEARANCES OF COUNSEL**

*Hal R. Lieberman* of counsel *(Michael A. Gentile,* attorney), for petitioner.

No appearance on behalf of respondent.

**OPINION OF THE COURT**

Per Curiam.

Respondent Peter G. Schmidt* was admitted to the practice

---

* Respondent represents himself in these proceedings.

of law by this court on March 13, 1961. At all times relevant herein, respondent has maintained an office for the practice of law within this judicial department.

Petitioner Departmental Disciplinary Committee moves for an order confirming the findings of fact and conclusions of law of its Hearing Panel. The Hearing Panel also has recommended that the respondent be disbarred from the practice of law.

On November 17, 1987, respondent tendered his resignation from the Bar pursuant to 22 NYCRR 603.11. In an affidavit of resignation, respondent admitted that while serving as an escrow agent in connection with the purchase by his client, H. C. Sleigh Netherland, B.V. (Sleigh), of a 50% stock ownership interest in a coal company, A.O.V. Industries, Inc. (A.O.V.), he wrongfully diverted a $1,500,000 escrow deposit to a commingled Swiss bank account, failed to pay over the funds on August 4, 1986 when they were due and repeatedly supplied misleading information to Sleigh as to the status and location of the escrow funds.

As a consequence of the foregoing admissions, the Departmental Disciplinary Committee moved this court on March 3, 1988 (M-1025) to accept respondent's resignation. However, while the motion was pending, the Committee received evidence of a second incident wherein respondent, between February and August of 1987, misappropriated $1,019,500 in funds belonging to another client, Constantin Dumba (Dumba). Much of the Dumba misappropriation occurred during the very same period of time within which respondent was under investigation by the Committee in connection with the Sleigh escrow conversion (June through Nov. 1987). Therefore, on April 22, 1988 the Committee moved (M-1662) for an order rejecting respondent's affidavit of resignation and immediately suspending him from the practice of law pursuant to 22 NYCRR 603.4 (e) pending disposition of charges on both the Sleigh and Dumba matters. Respondent did not respond to the Committee's motion.

By notice of motion (M-1809) dated April 26, 1988, respondent's counsel moved to be relieved due to his inability to locate respondent. It is believed that respondent left the country on February 26, 1988.

In its order of July 15, 1988 this court rejected respondent's affidavit of resignation, suspended him from the practice of law pending determination of the charges against him, and

granted the application by respondent's counsel to be relieved. *(Matter of Schmidt,* 139 AD2d 170.)

Meanwhile, the Committee on May 9, 1988 attempted to serve respondent by certified mail with a notice and statement of charges at his former law office and last known residential addresses. Additionally, on May 10 and 11, 1988 an investigator employed by the Committee attempted to personally serve respondent or a member of his family, at said locations, with the notice and statement of charges, to no avail. Finally, on May 12, 1988 the investigator left an envelope addressed to respondent containing the notice and statement of charges with a doorman at the residence of respondent's wife.

Respondent never answered the notice and statement of charges, nor did respondent appear at a hearing convened by a Hearing Panel of the Committee on July 19, 1988.

Following receipt of testimony and evidence, the Hearing Panel found with respect to charge one that respondent, while serving as an escrow agent, wrongfully converted a $1.5 million escrow deposit in violation of Code of Professional Responsibility DR 1-102 (A) (4) and (6), failed promptly to pay over the escrow funds when due and owing in violation of DR 9-102 (B) (4) and repeatedly supplied misleading information to interested parties as to the status and location of the escrow funds during the term of the escrow agreement in violation of DR 1-102 (A) (4) and (6). These findings were based upon admissions contained in respondent's sworn affidavit of resignation, tendered on or about November 17, 1987. This affidavit stated in part as follows:

"3. The pending investigation concerns my conduct as an escrow agent under an Escrow Agreement dated August 18, 1981, the parties to which were Leonard R. Glass, Esq., H. C. Sleigh Netherlands, B.V. ('Sleigh'), J. Richard Knop and Mark N. Bruce (the 'Sellers'), and me. The Escrow Agreement was executed pursuant to the terms and conditions of a Stock Purchase Agreement, dated June 25, 1981, pursuant to which Sleigh agreed to acquire from the Sellers a 50% stock interest in a coal company named AOV Industries, Inc. ('AOV') in exchange for the payment of $20,000,000., $17,000,000. of which was invested in AOV and $3,000,000. of which was to be paid to the Sellers. At the time the Stock Purchase Agreement was signed, $100,000. was paid to the Sellers directly by Sleigh and the balance of $2,900,000. was to have been placed in escrow with me as a consequence of my service as counsel

for Sleigh in connection with the AOV stock purchase. However, Sleigh advanced an additional $1,400,000. to the Sellers and agreed to place the remaining amount of $1,500,000. in escrow under the Escrow Agreement.

"4. On August 19, 1981, and again on September 14, 1981, Sleigh wired the sums of $750,000 (for an aggregate total of $1,500,000.) to my special account at Morgan Guaranty Trust Company. According to the Escrow Agreement, the funds were required to be held in escrow until a period of time *after* audited financials of AOV were provided to Sleigh. The Escrow Agreement further provided that Sleigh could make claims against the funds in escrow to the extent that any of the representations and warranties provided by the Sellers proved false and Sleigh was thereby damaged. Upon information and belief, the required audited financials of AOV were never delivered to Sleigh. On August 20, 1982, Sleigh advised me that it was asserting claims against the Sellers for an amount in excess of the entire escrowed funds and demanded that I pay the said sums over to Sleigh. Shortly thereafter, counsel for the sellers advised me that the Sellers disputed the validity of the claims asserted by Sleigh and demanded that I continue to retain control over the escrowed funds until the disputes between Sleigh and the Sellers were resolved through litigation. * * *

"6. At the time of the escrow funds transfer to me in 1981, I decided not to keep those funds in a segregated U.S. bank account. Instead, as more fully explained below, I chose to place those funds in a foreign account, and with the assistance of a long-standing client and friend, made arrangements to establish an account in Switzerland under the name of a newly organized Panamanian Corporation, Greycliff International, S.A. I then caused the escrow funds to be transferred to the 'Greycliff' account in Switzerland. I specifically acknowledge that in so doing I did not create and establish a separate and distinct escrow account in accordance with the terms of the 1981 Escrow Agreement that I had signed. I also acknowledge that I improperly transferred the escrow funds without the knowledge and consent of my client (Sleigh) or any of the other parties to the Escrow Agreement.

"7. I further acknowledge that on three separate occasions I supplied misleading information to my client about the location of the escrow funds. On October 29, 1982, I sent what appeared to be an account statement to Sleigh indicating that the funds were deposited in an account at the Canadian

Imperial Bank of Commerce in New York in my name as escrow agent. On January 31, 1984 and January 30, 1985, I again advised Sleigh that the funds were still held at the Canadian Imperial Bank of Commerce. These statements were false and I knew them to be so when I made them. However, on all three occasions, I had been advised by the managing agent of Greycliff that the funds would be made available to me in New York at said bank.

"8. * * * When I made known to the other parties to the Escrow Agreement that I would not be able to turn the escrow funds over to Sleigh in a timely fashion, they began a second lawsuit captioned *Petersville Sleigh Ltd. et al. v. Schmidt et al.,* 86 Civ. 7959 (RO). On February 19, 1987, pursuant to the escrow litigation, I entered into a Stipulation and Order in which I admitted that I was indebted to Sleigh for the entire amount of the escrow account plus interest. Thereafter, I repaid to Sleigh $2,300,000. that was due and owing on August 4, 1986, as well as $211,500. in interest and an additional $150,000. in legal fees."

With respect to charge two, the Hearing Panel found that on February 23, 1987, respondent transferred $125,000 from the account of Constantin Dumba at the M and T Bank to the account of respondent's law firm at the Bank of New York; on June 11, 1987 respondent procured a bank check drawn on Dumba's account at the M and T Bank in the amount of $149,500 payable to the order of "R.R. Cripps", an apparently fictitious entity; on July 8, 1987, respondent instructed M and T Bank to transfer $250,000 from Dumba's account to an account which respondent maintained at the same bank; on August 28, 1987 respondent withdrew $495,000 from Dumba's $500,000 line of credit with LBS Bank and transferred the funds to his law firm's account at the Bank of New York; and respondent, on February 25, 1988, acknowledged under oath that the foregoing withdrawals of funds from Dumba's accounts were without authorization and, thereafter, executed a confession of judgment in favor of Dumba for $1,100,000 but defaulted in all supplemental proceedings.

Based upon the foregoing, the Hearing Panel concluded that respondent, by misappropriating and converting approximately $1,100,000 of Dumba's funds, had violated DR 1-102 (A) (4) and (6). The Hearing Panel in recommending respondent's disbarment stated: "Apart from repayment of the *Sleigh* escrow, there is no evidence of any mitigating circumstance. To the contrary, respondent has engaged in a pattern

of intentional misappropriation of client * * * escrow funds dating back to 1981, has blatantly misrepresented to his clients and to third parties the facts related to these transactions, and has now absconded with $1.1 million belonging to another client. He has failed to interpose an Answer or otherwise appear at these proceedings."

By notice of petition dated September 8, 1988, the Departmental Disciplinary Committee now seeks an order confirming the report of its Hearing Panel and imposing the recommended sanction, disbarment. Notice of this petition as well as the petition itself, were published in the New York Law Journal on September 20, 1988 in accordance with this court's order of publication issued September 6, 1988. To date, respondent has failed to interpose an answer to the petition.

The evidence more than adequately supports the findings and conclusions of the Hearing Panel that respondent is guilty of professional misconduct in that he violated Code of Professional Responsibility DR 1-102 (A) (4), (6) and 9-102 (B) (4) by converting clients' and escrow funds, failing promptly to deliver over escrow funds which were due and owing, and misrepresenting to interested parties the status and location of such escrow funds.

Respondent has admitted under oath in an affidavit of resignation and in an affidavit of confession of judgment that he converted in excess of two million dollars. While he has made restitution to Sleigh, more than one million dollars remains due Constantin Dumba. Respondent executed a confession of judgment and then left the country, thereby making satisfaction of moneys due Dumba unlikely. No evidence in mitigation of respondent's serious misconduct is evident in either case.

In the absence of extremely unusual mitigating circumstances, this court has consistently viewed the conversion of client funds as warranting disbarment. (Matter of Malatesta, 124 AD2d 62, 64 [1st Dept 1987]; see also, Matter of Walker, 113 AD2d 254 [1st Dept 1985].) An attorney who misappropriates funds is presumptively unfit to practice law. This result is necessitated " 'by the obvious reflection on the attorney's integrity, and more importantly, by the duty to protect the public and to vindicate the public's trust in lawyers as custodians of clients' funds.' " (Matter of Pressment, 118 AD2d 270, 273 [1st Dept 1986], quoting Matter of Marks, 72 AD2d 399, 401 [1st Dept 1980].)

Accordingly, the report of the Hearing Panel is confirmed and the respondent is disbarred from the practice of law forthwith.

KUPFERMAN, J. P., ROSS, KASSAL, ROSENBERGER and SMITH, JJ., concur.

Respondent's name is stricken from the roll of attorneys and counselors-at-law in the State of New York effective January 31, 1989.