In the Matter of SAUL RADOW and HELAINE BRICK, Attorneys, Respondents. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, May 4, 1993

---

### APPEARANCES OF COUNSEL

*Sharon Katz* of counsel *(Hal R. Lieberman,* attorney), for petitioner.

*Vivian Shevitz* for Saul Radow, respondent.

*Larry Silverman* for Helaine Brick, respondent.

### OPINION OF THE COURT

Per Curiam.

Respondent Saul Radow was admitted to the practice of law as an attorney and counselor-at-law in the State of New York by the Appellate Division of the Supreme Court, Second Judicial Department, on March 5, 1975. Respondent Helaine Brick was admitted by the Appellate Division, Second Department, on September 7, 1977. At all times relevant herein, they maintained an office or offices for the practice of law within the First Judicial Department.

Petitioner Departmental Disciplinary Committee served respondents with a notice and statement of charges on November 6, 1991 and an amended notice and statement of charges on December 2, 1991, alleging that they had violated Code of Professional Responsibility DR 1-102 (A) (4), (5) and (6) in that between February of 1982 and September of 1983, they prepared false invoices, made false entries in a corporate tax return, engaged in improper transactions designed to generate cash and failed to file a Form 1096 with the Internal Revenue Service (IRS) as part of their role in a scheme to pay a purported unearned "brokerage fee" to one Alex Liberman and to conceal the payments from the IRS. Respondents thereafter filed an answer in which they admitted virtually all of the facts asserted in the charges. They stated that they had come to accept that their prior conduct was in violation of DR 1-102 (A) (4), (5) and (6) although they did not intend to contravene any rules. Respondents further conceded that they should have known at the time that they were guilty of professional misconduct.

It is, thus, undisputed that respondents committed the disciplinary infractions of which they were accused, and the only issue involved herein is the sanction to be imposed. In that regard, respondents propose mitigation and a private reprimand. At the hearings conducted in connection with this matter, the following was elicited: Saul Radow is 44 years of age, married and the father of two children. Helaine Brick is 40 years old, married and also has two children. Shortly after they became attorneys, both joined their local political clubs and obtained positions as counsel to a State Assemblyman. Their respective Albany schedules were not full-time, and so they were able to maintain a part-time law practice. It was through their legislative jobs that respondents became acquainted with each other, and, in 1980, they formed a partnership to practice law in New York City while continuing their work in Albany.

Radow was approached in 1981 by one Alex Liberman, who was then Director of Lease Negotiations of the New York City Department of General Services. Liberman suggested that if respondent were to obtain a real estate broker's license, he, Liberman, could provide substantial business. Accordingly, Radow, as well as Brick, procured such licenses. At Liberman's direction, they then entered into three brokerage commission agreements with a private landlord, Albert Corwin, pursuant to which a payment in excess of $400,000 was to be made in two installments by Corwin to respondents upon the approval by the New York City Board of Estimate and the New York State Financial Control Board of the renewal of three leases of properties owned by Corwin.

Significantly, respondents performed no services in connection with the underlying transactions, but, on February 3, 1982, they received three checks from Corwin totaling $210,835.40. The checks were deposited into a bank account opened in the name of Terre A Mer Ltd., a corporation formed by respondents precisely for this purpose. Liberman advised respondents that he wanted, in cash, half of the money that they had acquired from Corwin. Although they initially put up some resistance to this arrangement, they eventually acceded to Liberman's demand. For more than a year and a half, respondents, with the assistance of their accountant, devised various means to meet Liberman's request for cash, including such stratagems as cashing checks on the Terre A Mer account falsely made out to petty cash; writing checks to themselves for nonexistent consulting services; preparing false

invoices and making out checks on the corporate account to an alleged company, M & G Associates, for investigative services that never took place, receiving cash back minus a percentage of the check amounts; writing a $30,000 check on the Terre A Mer account for a mortgage to Brick's parents with $10,000 being returned in cash; and giving an individual a $27,000 corporate check, which amount was reimbursed in cash less a percentage thereof. In addition, respondents generated cash for Liberman by writing checks, on their law partnership account, to the order of M & G Associates.

Respondents testified that Liberman asked that they become involved in another similar real estate transaction but that they rejected his proposal. However, they continued to pay Liberman cash with respect to the Corwin deal. When Corwin's second installment of $210,835.40 arrived on December 31, 1982, the checks were deposited in the Terre A Mer account, and approximately $25,000 of that total was turned over to Liberman in cash but the payments finally ceased when respondents learned of Liberman's arrest on September 13, 1983. To conceal the payments from the IRS, respondents reported false deductions and entries on Terre A Mer's 1982 tax return. They did not issue Form 1099 reflecting the cash payments to Liberman, and their failure to file Form 1096 eventually resulted in a Federal prosecution and conviction of a misdemeanor in violation of 26 USC § 7203. However, respondents were not charged with the nonpayment of taxes. Since respondents cooperated with the United States Attorney's office and the Department of Investigation in the proceedings against Liberman, they were not indicted for their participation in the crimes committed by Liberman. Respondents also settled a lawsuit brought against them by the City of New York for approximately $190,000.

In mitigation, respondents fully admitted their misconduct and expressed contrition for their wrongs. They asserted that they had already been amply punished, both criminally and civilly, for their misdeeds, and, in addition, they had suffered other serious hardships. Since Liberman was a notorious figure who was constantly mentioned in news reports, respondents were exposed to much negative and embarrassing publicity. They were also both compelled to resign their Albany positions and eventually forced to leave their law firms as well. However, respondents explained, over the years since their involvement with Liberman, they had managed to put their lives back together, developed respectable law practices

and engaged in community service and *pro bono* activities. A number of witnesses testified to respondents' excellent reputation and integrity during the years following their dealings with Liberman. Respondents, pointing to the passage of time, their previously unblemished disciplinary records and their impeccable behavior after the Liberman episode, seek a private reprimand.

It is important to note that respondents became participants in an illegal scheme whose principle object was the theft of public funds, and they did so while they were presumably public servants. In furtherance of Liberman's machinations, they, in effect, laundered money for him and undertook a series of maneuvers to conceal the illicit payments to him, even to the extent of misleading the IRS. The fact that respondents claimed never to have asked Liberman any questions about his role in the underlying transactions or on whose behalf, if anyone, he was acting and that they purportedly did not pay attention to how New York City was affected does not extenuate their improper behavior. On the contrary, if respondents did not, as they contend, have any direct knowledge of Liberman's unlawful activities, it was clearly because they preferred not to know so that they could continue collecting money for which they performed no legal services. Indeed, Radow stated that he suspected that Liberman was endeavoring to prevent Corwin from learning that Liberman was making money from the transactions, while Brick contended that she assumed Liberman was intent on evading taxes on the funds procured through respondents' efforts. Thus, even assuming that respondents did not recognize the full range of Liberman's transgressions, they were aware that his behavior was unlawful, and they deliberately chose to refrain from informing themselves further. The arrangement was so suspicious on its face that it is inconceivable that reasonable persons, much less attorneys, would have no conception that they were engaged in an illegal scheme. Respondents' misconduct is simply too serious for them to escape with less than the most stringent disciplinary sanction merely because they have already sustained personal and professional setbacks and these proceedings have been pending for such an extended period of time.

Moreover, respondents' misdeeds cannot be minimized, as respondents appear to urge, on the ground that they never impaired the interests of any of their clients. Similarly, their cooperation with the investigations concerning Liberman can-

not form the basis for an avoidance of a severe disciplinary penalty, and, in fact, respondents have already benefitted by their cooperation with the Federal authorities. As for respondents' commendable present life style, it does not cancel out their prior misconduct. They are now conducting themselves in the manner that lawyers are expected to behave at all times. Respondents were clearly major players in a scheme whose primary purpose was to steal money, in this instance from the government. In the absence of extremely unusual circumstances not here present, this Court has consistently deemed the conversion of funds, whether those belonging to a client or a third party, to be grave misconduct warranting the severe penalty of disbarment *(Matter of Messina,* 180 AD2d 370; *Matter of Schmidt,* 145 AD2d 103).

Therefore, petitioner's application is granted to the extent of confirming the findings of fact and conclusions of law of the Hearing Panel, and respondents are hereby disbarred from the practice of law in the State of New York, effective immediately.

MURPHY, P. J., MILONAS, ROSENBERGER, KASSAL and RUBIN, JJ., concur.

Respondents are disbarred from practice as attorneys and counselors-at-law in the State of New York, effective May 4, 1993.